## Ritchey v. The Medical Center of Beaver

*Mark J. Homyak,* for plaintiff.
*Mashall J. Tindall,* for defendant Medical Center.
*Lynn E. Bell,* for defendant Brody.

KWIDIS, *J.,* November 16, 2007—

## FACTS

This is a medical malpractice case wherein the plaintiff, Joseph E. Ritchey, suffered a permanent brain injury as the result of a cardiopulmonary arrest that occurred at the conclusion of a surgical procedure performed by Dr. David Rafalko on April 13, 2000, at The Medical Center of Beaver County.

On April 8, 2002, a complaint was filed by the plaintiff's sister, Suzanne F. Woodson, as guardian ad litem, against The Medical Center of Beaver, an operating division of Valley Medical Facilities Inc. (Medical Center) and against the attending anesthesiologist, Michael C. Brody M.D., alleging the following facts.

Plaintiff underwent an elective uvulopalatopharyngoplasty (UP3) for treatment of obstructive sleep apnea on April 13, 2000 at the Medical Center, with the general anesthesia being provided and overseen by Brody.[1] After the surgery was completed, the patient was in a period of opioid induced depression as the result of Fentanyl administration, causing Ritchey to be sedated and in respiratory depression.[2] Narcan was given by a certified registered nurse anesthetist (CRNA) in an attempt to reverse the post-operative opioid depression induced by Fentanyl. The patient remained in a period of known risk for opioid-induced respiratory depression and sedation, due to his underlying conditions and body structure.[3] A CRNA, Sharon Spratt, attempted to page Brody and when Brody did not respond, caused Ritchey to be prematurely extubated prior to the time it was reasonably safe to do so, causing the patient to suffer a sudden respiratory arrest resulting in cardiac arrest, an anoxic brain injury, permanent injuries and damages.[4] The complaint pleads that the negligent premature extubation occurred as the result of the direct acts of Brody, his medical as-

---

1. Complaint, ¶¶6-7.
2. Complaint, ¶13.
3. Complaint, ¶15.
4. Complaint, ¶¶15, 16, 17, 21.

sociates and a CRNA, who was an employee of the Medical Center.[5]

After the premature extubation and administration of drugs, Ritchey suffered a sudden respiratory arrest resulting in cardiac arrest as the direct result of the premature extubation.[6] As the direct result of the cardiopulmonary arrest, Ritchey suffered permanent brain damage in the form of anoxic encephalopathy, resulting in impairment of his ability to think, speak, ambulate, control his bodily functions and/or otherwise live the life he did prior to suffering the injury.[7] Plaintiff's damages included increased medical, nursing and life care expenses, pain, suffering and inconvenience, loss or limitation of enjoyment of life and permanent surgical scarring.[8]

The Medical Center filed an answer and new matter on April 26, 2002 that did not aver that Brody was an independent contractor, nor did it admit that Brody was an agent of the Medical Center. The Medical Center did not file a cross-claim against Brody. The Medical Center did not admit that the CRNA, Sharon Spratt, was an employee of the Medical Center.

Brody filed an answer on August 28, 2002, that generally denied all of the allegations of the plaintiff's complaint. The answer did not aver any new matter. It is important to note at this point, due to the subsequent argument of counsel for Brody concerning the effect of the joint tort-feasor release (JTR) tendered by the Med-

---

5. Complaint, ¶¶14, 18, 19, 20.
6. Complaint, ¶16.
7. Complaint, ¶17.
8. Complaint, ¶21.

ical Center, that there was no averment that Brody was an agent of the Medical Center, nor that the attending CRNAs were agents of Brody. There was no cross-claim filed against the co-defendant, Medical Center.

The plaintiff's testifying expert, an anesthesiologist, Miles Dinner M.D., prepared a report, dated March 2, 2005, outlining his opinions as to the deviations from the standard of care as follows:

"(1) Failure to appreciate the history and severity of the plaintiff's sleep apnea;

"(2) Failure to understand the nature of the surgical intervention;

"(3) Failure to appreciate the patient's history of bronchospasm;

"(4) Failing to supervise the CRNA during the critical portions of a procedure;

"(5) Over-narcotization of the patient;

"(6) Administering multiple beta-blockers to the plaintiff with known wheezing problems;

"(7) Failing to note the impending signs of hypoxia;

"(8) Failing to timely intervene to restore oxygenation."

The thrust of Dr. Dinner's report was the period of emergence and the immediate phase of recovery after extubation, which is the critical time in the anesthetic management of a patient. This was described as a "take-off" and "landing."

The testifying expert of Brody, Dr. Christopher A. Troianos, whose report of January 24, 2006 responded

in item by item form to the report of Dr. Dinner, opined that the care provided by Brody was within the standard of care for an unexpected cardiac event.

At a second pretrial conference conducted on April 11, 2007, Brody, filed a motion in limine that attempted to limit the plaintiff's expert's testimony so that Dr. Dinner would not be able to testify about any of the reasons why he determined that the extubation was premature based on the contention that it was beyond the scope of the complaint. This court denied Brody's motion.[9]

Plaintiff's counsel verbally moved for leave to amend the complaint at that conference. The motion was granted by the court.[10] Since the court had already denied the motion in limine to preclude such testimony, determining that it merely amplified the complaint's theory, the court granted the motion for leave to amend.[11] The court also offered defendants a continuance of the trial if they contended they were unable to prepare for trial as the result of the court's rulings, which they declined.[12] Plaintiff's counsel also offered, and Brody's counsel accepted, an agreement that the defendant did not have to file an answer to the amended complaint's averments, as deemed to be denied. This agreement was approved by the court.[13]

---

9. Pretrial conference transcript (dated April 11, 2007), pp. 14-16.

10. Pretrial conference transcript (dated April 11, 2007), pp. 21-23.

11. Pretrial conference transcript (dated April 11, 2007), pp. 21-23.

12. Pretrial conference transcript (dated April 11, 2007), pp. 17-19.

13. Pretrial conference transcript (dated April 11, 2007), pp. 22-23.

Plaintiff filed an amended complaint on April 24, 2007, which contended that the negligently premature extubation was the result of:

"(a) the negligently inadequate preoperative evaluation by Brody's agent, Loffredo-Mancinelli;

"(b) Brody's failure to form an anesthetic plan appropriate for the patient's history;

"(c) Brody's failure to consider the effects of the surgery upon the patient's airway;

"(d) Brody's failure to consider the effects of the patient's overnarcotization and/or the temporary masking effect of Narcan administration;

"(e) Brody's failure to consider the impact of the administration of beta blockers on a patient with a history of bronchospasm; and,

"(f) Brody's failure to require that he be present and/or his failure to be present during and shortly after the extubation in order to closely monitor, detect and correct the likely complication of respiratory distress that he should have anticipated." [14]

On May 1, 2007, the Medical Center verbally increased its initial offer of $100,000 for a JTR of $250,000, to which plaintiff's guardian ad litem indicated her verbal acceptance, communicated verbally by plaintiff's counsel to Medical Center's counsel the next day. Counsel for the Medical Center drafted the JTR and transmitted it on May 2, 2007. Plaintiff's guardian ad litem executed

---

14. Amended complaint in civil action, ¶14.

the same on May 7, 2007 with the same being transmitted to Medical Center's counsel on May 8, 2007.

On May 10, 2007, one day before jury selection, Brody filed an amended answer and new matter and cross-claim, pleading the JTR. During pretrial proceedings prior to jury selection on May 11, 2007, the court stated:

"It is a joint tort-feasor release that's limited to and only applies to The Medical Center of Beaver County, an Operating Division of Valley Medical Facilities, the defendants (sic) in this case. However, the Medical Center of Beaver County and Valley Medical Facility shall be required to sit the trial of this case for purposes of the apportionment of negligence, if any, as between The Medical Center and Dr. Brody. Any objection to that?" [15]

Ms. Kane, as substitute counsel for the Medical Center, responded in the negative for the Medical Center, and Brody's counsel stated no objection to the court's ruling and interpretation.[16] The court also granted plaintiff's request that the amended answer and new matter be deemed denied without the filing of a pleading by plaintiff.[17]

During the course of the trial, counsel for Brody, *for the first time* (emphasis added), at the conclusion of the plaintiff's case, presented to the court a written motion for compulsory nonsuit. The basis of the motion was that Brody and the other anesthesiologists in his group were

---

15. Trial transcript volume I (dated Friday, May 11, 2007), p. 5.

16. Trial transcript volume I (dated Friday, May 11, 2007), p. 5.

17. Trial transcript volume I (dated Friday, May 11, 2007), pp. 10-11.

ostensible agents of the Medical Center and that the JTR tendered to the Medical Center also completely released Brody from any direct and/or vicarious liability. This court denied the motion for compulsory nonsuit based on the testimony of the CRNA, Sharon Spratt, and the failure of defense counsel to plead the alleged relationship of Brody and the Medical Center and its employees, the attending CRNAs.

The jury returned a verdict on May 18, 2007 in favor of the plaintiff and against both defendants in the amount of $1,500,000, consisting of $70,163.65 in past medical expenses, increased personal care in the amount of $300,000 and noneconomic damages for pain and suffering, disfiguration, embarrassment, inconvenience, humiliation and loss of ability to enjoy the pleasure of life in the amount of $1,129,836.35. The jury determined both defendants to be causally negligent, attributing 70 percent causal negligence to the Medical Center and 30 percent to Brody. Brody's counsel polled the jury, revealing it to be an 11 to 1 verdict, but no party made any objections to the form of the verdict or the amounts awarded, or requested the court to send the jury back for further deliberations after further instructions.[18]

Plaintiff filed a timely motion to mold the verdict and add delay damages, to which Brody filed a timely response. Plaintiff then filed an amended motion to mold verdict, add delay damages and enter final judgment, to which both defendants filed timely responses. Plaintiff also filed a petition to approve the JTR settlement pursu-

---

18. Trial transcript volume VI (dated Friday, May 18, 2007), pp. 1536-39.

ant to Pa.R.C.P. 2064(a) and Local Rule LR2064, both of which require court approval for the settlement of an incapacitated person's claim. Defendants filed timely responses.

The issues raised by these motions are:

"(1) did defendants attempt to collude to fraudulently induce plaintiff's counsel and guardian ad litem to enter into a JTR settlement with Medical Center, and to convince the court to approve the same, when Medical Center and Brody both believed that it would be a complete release as to all parties?;

"(2) whether there was a meeting of the minds between plaintiff's guardian ad litem and Medical Center on the JTR settlement agreement?;

"(3) whether the JTR settlement would be in the best interests of the incapacitated plaintiff?;

"(4) whether the court should approve plaintiff's JTR settlement with Medical Center and mold the verdict, entering judgment against Medical Center for the amount called for in the JTR and against Brody for his causally liable portion of the entire verdict, only, based upon the jury's apportionment, plus a proportionate share of the delay damages?;

"(5) whether plaintiff was responsible for any period of alleged delay such that Brody should obtain relief for some portion of the period during which delay damages would normally be awarded against him under Pa.R.C.P. 238 principles?"

The court order issued a rule to show cause why the JTR should not be invalidated and ordered the parties to take discovery upon the issues raised by those motions concerning the JTR. All counsel were deposed.

On July 12, 2007, the plaintiff filed a motion to invalidate agreement of settlement pursuant to Pa.R.C.P. 229.1(d)(1), as a result of the Medical Center's position that the admission of the JTR settlement agreement into evidence without objection by plaintiff constituted court approval of the settlement. Plaintiff's position was that if the agreement were "approved" as the Medical Center contended, it had no excuse for having failed to pay the $250,000 consideration set forth in the agreement within 20 days, as more than 20 days had elapsed since the "approval" event, and the money had not been paid. The Medical Center filed a timely response.

The Medical Center also filed a timely motion for post-trial relief requesting that in the event that the court were to not approve the JTR settlement, that the court not mold the verdict, but rather, order a new trial.

Brody filed a timely motion for post-trial relief raising the following issues:

"(1) The court erred in granting leave to file the amended complaint containing a new cause of action after the statute of limitations ran;

"(2) The testimony of plaintiff's expert, Dr. Dinner, that Brody was required to be present during extubation was contrary to Pennsylvania law, and should have been stricken;

"(3) The court erred in denying Brody's motion for a compulsory nonsuit on the basis that Brody was released by the JTR of the Medical Center;

"(4) The court erred in denying Brody's motions to strike certain jurors for cause;

"(5) The court erred giving particular jury instructions;

"(6) Ms. Woodson's testimony as to the quality of the Autumn Lane Nursing facility, and her counsel's statements in closing concerning the conditions at Autumn Lane were against the agreement that plaintiff would not seek future medical/lodging costs beyond those stipulated to, and the jury verdict was inconsistent."

Plaintiff filed timely responses to both defendants' post-trial motions.

As a result of Brody's contention, that the JTR entered into between the plaintiff and the co-defendant, Medical Center, also released Brody, the plaintiff filed a petition for approval of the JTR settlement on May 30, 2007.

On June 1, 2007, this court issued a rule to show cause why the release should not be invalidated. Subsequently the depositions of the attorneys were scheduled to determine the intent of the parties concerning the JTR. On August 28, 2007, an evidentiary hearing and argument was conducted on the effect of the JTR.

On October 24, 2007, this court issued an order denying the defendants' post-trial motions, approving the JTR, granting the plaintiff's motion to mold verdict and add delay damages and entered final judgment on the verdict of May 18, 2007.

## THE COURT DID NOT ERR IN PERMITTTING PLAINTIFF TO FILE AN AMENDED COMPLAINT

Pa.R.C.P. 1033 states that a party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, correct the name of a party or amend his pleading. The Pennsylvania Superior Court has further stated that amendments to pleadings are permitted at any time, including before, during and

after trial.[19] Although no absolute right to amend exists, the courts of this Commonwealth have liberally construed the principle embodied in this rule.[20] Consequently, courts have allowed amendments of pleadings *at any time,* as provided by the specific language of Rule 1033. Leave to amend pleadings is to be liberally granted and a party is to be given leave to amend its pleadings when allowing the amendment will not unduly prejudice or surprise the adverse party.[21] Undue prejudice in this analysis has been defined as something more than a detriment to the other party, as any amendment would likely have the effect of harming the adverse party's interests.[22] The policy underlying this rule of liberal leave to amend is to insure that parties get to have their cases decided on the substantive case presented, and not on legal formalities.[23] However, a new cause of action will not be permitted after the statute of limitations has run. Only if the proposed amendment merely amplifies, as opposed to altering, the cause of action already averred, will it be allowed if the statute of limitations has run.[24]

In *Chaney v. Meadville Medical Center,* the Superior Court held that the administratrix of the deceased patient's estate was entitled leave to amend pleadings so as to more specifically define the exact cause of patient's death in a medical malpractice action, even though the leave to amend was requested after the statute of limita-

---

19. *Chaney v. Meadville Medical Center,* 912 A.2d 300, 303 (Pa. Super. 2006).

20. *Chaney,* 912 A.2d at 303.

21. *Id.* at 303.

22. *Id.* at 303.

23. *Id.* at 303.

24. *Id.* at 304.

tions had run, where the amendments did not allege a new theory of liability.[25] The court concluded that the trial court did not err "to the extent that the amendments more specifically define the exact cause of [plaintiff's] death."[26] The court further stated that the amendments did not allege a new theory of liability. "To the contrary, the underlying averments of malpractice were unchanged. The amendments merely clarified the causal chain that connected the breach(es) of duty to [plaintiff's] death."[27]

As described *supra,* the amendment of the original complaint was precipitated by Brody's motion in limine regarding the contention that Dr. Dinner's opinions were outside the scope of the theory pled in the complaint. This court denied the motion stating that Dr. Dinner's report did not surprise or prejudice Brody in that his expert report, authored by Dr. Troianos, directly addressed the points raised by Dr. Dinner.

Brody's motion for post-trial relief avers prejudice in that the amended complaint alleges a new cause of action after the statute of limitations had run. The original complaint alleges that general anesthesia was maintained with intravenous Fentanyl, an opioid, and Isoflurance, an inhalational anesthetic.[28] The surgical procedures began at approximately 11:45 a.m. and ended at approximately 12:55 p.m.[29] At approximately 1:10 p.m. Brody ordered the medications Narcan, Neostigmine,

25. *Chaney,* 912 A.2d 300.
26. *Id.* at 304-305.
27. *Id.* at 305.
28. Complaint, ¶8.
29. Complaint, ¶9.

and Glycopyrrolate and/or the same were administered either directly by him or under his direction and control.[30] Shortly thereafter, Brody, either directly or through a person on the anesthesia and/or operative team under his direction and control, negligently prematurely extubated the patient prior to the time it was reasonably safe to do so.[31] The said negligent premature extubation was performed during a period of known risk for opioid-induced respiratory depression and sedation for the patient, who was at increased risk due to his underlying conditions and body structure.[32]

As delineated in the facts provided by the court, the amended complaint alleges that the negligent premature extubation was the result of: (a) the negligent inadequate preoperative evaluation by Brody's agent Loffredo-Mancinelli; (b) Brody's negligent failure to form an anesthetic plan appropriate for the patient's history; (c) Brody's negligent failure to consider the effects of the surgery upon the patient's airway; (d) Brody's negligent failure to consider the effects of the patient's overnarcotization and/or temporary masking effect of Narcan administration; (e) Brody's negligent failure to consider the impact of the administration of beta blockers on a patient with a history of bronchospasm; and, (f) Brody's failure to require that he be present during and shortly after the extubation in order to closely monitor, detect and correct the likely complication or respiratory distress that he should have anticipated.[33]

30. Complaint, ¶10.
31. Complaint, ¶14.
32. Complaint, ¶15.
33. Amended complaint, ¶14.

Therefore, this court correctly concluded that the amended complaint merely amplified the factual background of the original complaint and did not allege a new cause of action or alter the cause of action against Brody. As in *Chaney v. Meadville Medical Center,* the amended complaint in the instant case more specifically defined the exact cause of Ritchey's condition and clarified the causal chain of events that ultimately led to Ritchey's present health condition. Furthermore, the amendment did not unduly prejudice or harm Brody's interests. Brody's expert report responded to plaintiff's expert report point by point and the court further offered the defendants a continuance if they felt that they needed more time to prepare for trial, which defendants declined. Accordingly, this court did not err in permitting plaintiff to file an amended complaint.[34]

## THE TESTIMONY OF PLAINTIFF'S EXPERT, DR. DINNER, DID NOT CONTRADICT PENNSYLVANIA LAW

During trial, Brody attempted to introduce sections of the Pennsylvania Administrative Code, 28 Pa.Code §123.7, entitled "Dental anesthetist and nurse anesthetist qualifications" and 49 Pa.Code §21.17, entitled "Anesthesia." The court notes that these Pennsylvania Administrative Code sections had not been mentioned or discussed at any time prior to introducing the Code sections on the day of trial. The court researched and provided

---

34. The court further addresses the amended complaint prior to beginning trial found in trial transcript volume I (dated Friday, May 11, 2007) pp. 18-27.

copies of the Code sections to plaintiff's counsel during Dr. Dinner's cross-examination.

Section 21.17 of the Code states that the administration of anesthesia is a proper function of a registered nurse and is a function regulated by this section; this function may not be performed unless: Subsection (4), at issue at the time of trial, which states:

"Except as otherwise provided in 28 Pa.Code §123.7(c) (relating to dental anesthetist and nurse anesthetist qualifications), when the operating/anesthesia team consists entirely of nonphysicians, such as a dentist and a certified registered nurse anesthetist, the registered nurse anesthetist shall have available to her by physical presence or electronic communication an anesthesiologist or consulting physician of her choice."

Section 123.7 of the Code, "Dental anesthetist and nurse anesthetists," states:

"(a) Qualified dentist anesthetists and nurse anesthetists must be able to provide general anesthesia under the overall direction of either:

"(1) The director of anesthesia services or his designee, when a full-time anesthesiologist heads the anesthesia service.

"(2) The surgeon or obstetrician responsible for the care of the patient.

"(b) Qualified dentist anesthetists and nurse anesthetists shall be competent to:

"(1) Induce anesthesia.

"(2) Maintain anesthesia at required levels.

"(3) Support life functions during the period in which anesthesia is being administered, including induction and intubation procedures.

"(4) Recognize and take appropriate corrective action, including the requesting of consultation, when necessary, for abnormal patient responses to the anesthesia or to an adjunctive medication or other form of therapy.

"(5) Provide professional observation and resuscitative care, including the requesting of consultation, when necessary, until the patient has regained control of his vital functions.

"(c) When the operating/anesthesia team consists entirely of nonphysicians, for example, dentist with nurse anesthetist, dentist with dentist anesthetist, podiatrist with dentist or nurse anesthetist, a physician shall be immediately available in case of an emergency, such as cardiac standstill or cardiac arrhythmia. The requirement that the physician be immediately available may mean in the hospital or in the immediate proximity of the operative procedure area or within minutes of the operating suite."

Brody's post-trial motion argues that Dr. Dinner's testimony that Brody was required to be physically present during the extubation is contradictory to Pennsylvania legislation. The Code sections provided by Brody discuss the qualifications of dental anesthetists and nurse anesthetists and what actions they are competent to perform. Section 123.7(b)(3) states that qualified dentist anesthetists and nurse anesthetists shall be competent to induce anesthesia and to support life functions during the period in which anesthesia is being administered,

including induction and intubation procedures. Brody argues that under section 123.7(b)(3), a nurse anesthetist is qualified to engage in intubation procedures, which includes extubation. The court does not find where "intubation procedures" is defined to mean "extubation" and Brody does not cite the court to this definition.

At the time of trial, this court held that the Pennsylvania Code sections were not applicable to the standard of care for anesthesiologists and in addition that the sections pertaining to anesthesia teams of "nonphysicians" were not applicable in that the anesthesia provided to Ritchey was under the direction or supervision of a physician.[35] Brody did not cite to any authority that addressed the standard of care for anesthesiologists or whether an anesthesiologist has to be present at the time of extubation.[36]

However, experts for both the plaintiff and the defendant testified that there are crucial times in which the anesthesiologist should be present. Dr. Troianos explained the emergence process and stated that "we do want to be present during that process, and it is desirable to be there at the time of extubation, but we can't always be there."[37] Dr. Dinner testified:

---

35. Trial transcript volume III (dated Tuesday, May 15, 2007), pp. 710-12, trial transcript volume IV (dated Wednesday, May 16, 2007), pp. 825-32.

36. Dr. Dinner did testify on redirect examination that the anesthesiology standards of care are "set by the board that I referred to earlier, called the ASA, the American Society of Anesthesiologists, and they are national standards." Trial transcript volume III (Tuesday, May 15, 2007), p. 729.

37. Trial transcript volume VI (dated Friday, May 18, 2007), p. 1316.

"There are criteria that the American Society of Anesthesiologists set up as to the responsibilities of the attending anesthesiologist, and essentially, the anesthesiologist must be present at the critical elements, critical parts of the case. There are two critical parts of the case . . . the take-off and the landing, the take-off being the initiation of the anesthesia, and the landing being the emergence, extubation. The anesthesiologist must be present at the beginning, at the take-off, and at the landing, so those two key parts."[38]

In accordance with the experts' testimony, the court instructed the jury as follows:

"One of the things that was brought up in this case was whether Dr. Brody, the defendant, was required to be in the operating room the entire period of time that the surgery was to take place. I could find no law, nor is there a law that requires him to be there 100 percent of the time. However, both experts clearly indicated that that there are crucial times when he should be in there, and they used the analogy, take-off, when they put the tube in, and landing, when they take the tube out, and emergence, in other words, while he is coming out, and while the tube is taken out, and in this case, there is an issue of whether Dr. Brody was present at the time of extubation, in other words, when the tube was removed."[39]

Dr. Dinner's testimony that Brody was required to be present during extubation was not contrary to Pennsyl-

---

38. Trial transcript volume III (dated Tuesday, May 15, 2007), p. 660.

39. Trial transcript volume VI (dated Friday, May 18, 2007), pp. 1523-24.

vania law in that the Code sections presented by Brody were not applicable to the standard of care for anesthesiologists. Furthermore, both experts agreed that there are critical times in which the presence of an anesthesiologist is desired and this court instructed the jury as such.

## DR. BRODY WAS NOT RELEASED BY THE JOINT TORT-FEASOR RELEASE

The JTR provides in pertinent part as follows:

"Know All Men By These Presents that Suzanne F. Woodson (hereinafter referred to as the undersigned), on behalf of Joseph E. Ritchey, an incapacitated person, and their heirs, executors, administrators, successors and assigns, in consideration of the total sum of $250,000, the receipt of which is hereby acknowledged to the undersigned and paid on behalf of The Medical Center Of Beaver, an operating division of Valley Medical Facilities, Inc. and their officers, shareholders, representatives, servants, employees, affiliated entities, predecessors, successors and assigns (the released parties) from any and all liability, claims, causes of action, joinders for sole liability, contribution, indemnity or otherwise, damages, costs, expenses or demands . . . .

"It is understood and agreed that the undersigned is not releasing any claims or demands which she has or may have against any other person, association or corporation, except the released parties . . . ."

The law in Pennsylvania regarding releases is well settled, and is set forth as follows. Pursuant to Pennsylvania law, written releases are interpreted in accordance

with the rules of contract construction and the effect of a release is determined by the ordinary meaning of its language, unless a different meaning was clearly intended.[40] In construing a release, the foremost consideration is the intent of the parties. The intention of the parties is gathered from the language of the release and the circumstances surrounding its execution.[41] In determining the parties' intent, a court must first look to the language of the release and the language must be viewed in the context of the entire document. Each part of a release must be given effect. Therefore, terms in one section should not be interpreted to nullify or conflict with other terms. If one clause appears to conflict with another, the clauses should be construed, if possible, as consistent with one another.[42] If a release is unclear on its face, a court must inquire into the circumstances surrounding its execution. The surrounding circumstances act to clarify the intention of the parties and identify "matters which may be fairly said to have been within the contemplation of the parties when the release was given."[43]

In this case, upon review of the JTR, there are neither terms that are obscure due to indefiniteness nor capable of being interpreted in more than one fashion. This JTR is clear and unambiguous and the court must look at its content to determine its meaning.

Attorney Marshall J. Tindall, the drafter of the JTR, testified in his deposition of July 11, 2007 and at the

---

40. *A.G. Cullen Construction Inc. v. State System of Higher Education,* 898 A.2d 1145, 1167 (Pa. Commw. 2006).

41. *A.G. Cullen Construction Inc.,* 898 A.2d at 1167.

42. *Id.* at 1168.

43. *Id.* at 1167 n.2.

evidentiary hearing on August 28, 2007, that it was his intention to release the Medical Center only and that there was no intention to also release Brody.[44] This was confirmed by plaintiff's attorney, Mark J. Homyak's, deposition concerning acceptance of the JTR. Counsel for Brody, Lynn E. Bell, on May 11, 2007, prior to the selection of the jury, filed an amended answer and new matter that did not raise the issue of the JTR as also releasing Brody as an agent of the Medical Center. It is important to note that this position was not taken until Ms. Bell presented a written motion for compulsory nonsuit at the conclusion of plaintiff's case.[45]

In this motion for compulsory nonsuit counsel for Brody presented, for the first time, the argument that the CRNAs were employees of the Medical Center and that Brody was responsible for the supervision, then you should assume they (CRNAs) are agents of Brody.[46] Consequently, the release of the agents also released the principal.

This court denied the motion for compulsory nonsuit based on the absence of any pleadings and testimony that the CRNAs were agents of Brody when they were employed by the Medical Center.[47]

---

44. Mr. Tindall's deposition transcript, pp. 32, 37, 46, 57, 59, 60.

45. Trial transcript volume V (dated Thursday, May 17, 2007), p. 1214.

46. Trial transcript volume V (dated Thursday, May 17, 2007), pp. 1218-28.

47. Trial transcript volume V (dated Thursday, May 17, 2007), p. 1230.

## THE COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO STRIKE JURORS FOR CAUSE

Brody's motion for post-trial relief alleges that defendant was forced to use preemptory challenges to remove jurors that should have been excluded for cause. Case law reveals two situations in which challenges for cause should be granted: "(1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at voir dire."[48] The test for determining whether a prospective juror should be disqualified is "whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor."[49]

The purpose of jury voir dire examination is to secure a fair, competent and impartial jury. To achieve this purpose, general questions should be permitted so that it can be determined whether any veniremen have a direct or even a contingent interest in the outcome of the litigation or the parties involved.[50] The decision as to "wheth-

---

48. *Commonwealth v. Colon,* 223 Pa. Super. 202, 205-206, 299 A.2d 326, 327 (1972). (footnotes omitted)

49. *McHugh v. Proctor Gamble Paper Products,* 776 A.2d 266, 270 (Pa. Super. 2001).

50. *Capoferri v. Children's Hospital of Philadelphia,* 893 A.2d 133, 138 (Pa. Super. 2006).

er counsel may propose their own questions of potential jurors during voir dire is a matter left solely within the trial judge's discretion."[51] However, voir dire is not intended to provide counsel with a better basis upon which to exercise peremptory challenges; rather, it contemplates the use of probing questions that uncover bias and facilitate the exercise of challenges for cause.[52]

Generally, the trial court is in the best position to assess the credibility of a juror and determine if that juror is able to render a fair and impartial verdict.[53] "Claims of impartiality by prospective jurors are subject to scrutiny for credibility and reliability as is any testimony, and the judgment of the trial court is necessarily accorded great weight."[54]

In the instant case, the court posed a standard set of questions to the entire jury panel, followed by individual voir dire of each potential juror. The court presided over and participated in the voir dire in its entirety and personally observed the demeanor and conduct of the potential jurors. The court permitted counsel for both parties the opportunity to ask a broad range of follow-up questions as demonstrated in the trial transcript.[55] Fur-

---

51. *Commonwealth, Department of General Services v. U.S. Mineral Products Co.*, 927 A.2d 717, 733 (Pa. Commw. 2007). The scope of voir dire examination is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Petruse v. Woodhaven Foods*, 1991 WL 1011004 (C.C.P. 1991).

52. *Commonwealth, Department of General Services*, 927 A.2d at 733.

53. *McHugh*, 776 A.2d at 273.

54. *Commonwealth v. Ellison*, 588 Pa. 1, 9, 902 A.2d 419, 424 (2006).

55. See trial transcript volume I for jury voir dire.

thermore, each time one of the potential jurors expressed that they had negative medical experiences or experiences with medical malpractice cases the court questioned whether it would affect the juror's ability to sit on this jury, listen to the evidence, and render a verdict that is fair and impartial.[56]

Brody sought to exclude from the jury panel those persons (juror nos. 1, 3, 4, 10, 22, and 31[57]) who had direct or indirect experiences in medical malpractice cases. It should be noted that none of the potential jurors that Brody sought to exclude for cause had the "close relationship" with parties, counsel, victims, or witnesses that is required for the first situation in which a challenge for cause should be granted.

Instead, Brody argues that the prospective jurors had a presumed likelihood of prejudice due to situational affinity given their personal experiences and dissatisfaction with medical treatment, or their experiences with individuals who had filed medical malpractice cases.

While this court acknowledges that the jurors in question all expressed some direct or indirect experiences with the medical field and/or medical malpractice cases, they stated that they could be fair and impartial, and juror no. 3 stated "she thought she could be."[58] This court was satisfied that, after affording counsel the opportunity to inquire of the jurors, and witnessing the answers,

---

56. See trial transcript volume I.

57. See trial transcript volume I for jury voir dire. Juror no. 1, pp. 36-46; juror no. 3, pp. 52-57; juror no. 4, pp. 57-66; juror no. 10, pp. 97-103; juror no. 22, pp. 164-72; juror no. 31, pp. 212-20.

58. Trial transcript volume I (dated Friday, May 11, 2007), pp. 52-57.

conduct and demeanor of the potential jurors, firsthand, that the jurors in question could listen to the evidence and render a fair and impartial verdict.

## THE TRIAL COURT DID NOT ERR GIVING PARTICULAR JURY INSTRUCTIONS

In reviewing whether a trial judge gave a proper instruction, an appellate court will note that the "primary duty of a trial judge in instructing a jury is to clarify the issues so that the jury is able to comprehend the question they are to decide." [59]

Where the jury instruction fairly and accurately apprises the jury of the relevant law, a new trial is not warranted. A jury instruction, when considered in its entirety, must not only be erroneous but also prejudicial to the complaining party to constitute reversible error. [60]

In this case Brody contends that it was prejudicial when the court referred to two analogies used by plaintiff's counsel in closing argument as examples of an agency relationship.

A trial court has broad discretion in phrasing jury instructions and the scope of review in examining those instructions is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. [61] A charge will be found adequate unless "the issues are not made clear to the jury

---

59. *Chicchi v. SEPTA,* 727 A.2d 604, 609 (Pa. Commw. 1999), *petition for allowance denied,* 560 Pa. 750, 747 A.2d 371 (1999).

60. *Johnson v. City of Philadelphia,* 808 A.2d 978, 980 (Pa. Commw. 2002).

61. *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995).

or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error."[62] A new trial should not be granted on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental.[63]

In the preliminary instructions to the jury, this court stated that during the course of the trial I might say or do something which might lead some of you to think that this act indicates my personal feelings or opinion about the merits of this case. If any of you should come to such a conclusion, it is incorrect.[64]

In the concluding instructions the court further stated:

"I have invited your attention to various factors which you may consider in evaluating the evidence on behalf of the parties. In doing so, I have to tell you that I have not attempted to indicate my opinion on any matter, on any evidence, the weight of the evidence which you should consider, or any part of it. I do not want you to think that I did. In any event, once again, you are the sole judges of the facts, and you must determine the credibility of the evidence."[65]

In retrospect, this case was ultimately decided by this jury on the basis of a question that was presented during

---

62. *Gaylord ex rel. Gaylord v. Morris Township Fire Department,* 853 A.2d 1112, 1116 (Pa. Commw. 2004).

63. *Gaylord,* 853 A.2d at 1116.

64. Trial transcript volume II (dated Friday, May 11, 2007), p. 270.

65. Trial transcript volume VI (dated Friday, May 18, 2007), pp. 1501-1502.

jury deliberations: "In his testimony, did Dr. Brody get the page when it was time to extubate?"[66] In returning the verdict, the jury clearly understood and decided the major issue in this medical malpractice case.

## SUZANNE WOODSON'S TESTIMONY AS TO THE QUALITY OF THE AUTUMN LANE NURSING FACILITY AND THE TYPE OF FACILITY SHE WANTED MR. RITCHEY TO RESIDE IN AND HER COUNSEL'S STATEMENTS IN CLOSINMG CONCERNING THE CONDITIONS AT AUTUMN LANE WAS NOT AGAINST THE PARTIES' AGREEMENT THAT PLAINTIFF WOULD NOT SEEK FUTURE MEDICAL/LODGING COSTS BEYOND THOSE STIPULATED TO, AND THE JURY VERDICT WAS NOT INCONSISTENT

A second pretrial conference, in which a stenographer was present, was held on April 11, 2007 in which the issue of increased personal care versus future medical/lodging costs was discussed. The transcript of the conference reveals a "loose agreement" between the parties. Counsel for plaintiff stated:

"The only claim I wish to present is through accomodation (sic) of Dr. Dinner's testimony about the permanency of the conditions where Mr. Ritchey needs ongoing care with going to the bathroom and dressing and that type of thing and needs to be in a secured facility. But that, in combination with the lay testimony of the guardian ad litem, saying the exact same thing as Ms.

---

66. Trial transcript volume VI (dated Friday, May 18, 2007), pp. 1533-34.

Bell's expert, that there has been a 27 percent increase in the cost of the type of facility and that is projected to last for the rest of his life . . . ." [67]

Plaintiff's counsel further stated that he was not going to call any expert to state that Ritchey needs increased medical care. [68]

At this point of the conference, plaintiff's counsel and counsel for the Medical Center agreed that they would brief the issue. [69]

At the time of trial, Ms. Suzanne Woodson [70] testified concerning the conditions at Autumn Care Lane, the nursing home where Ritchey resided at the time of trial. Ms. Woodson testified that as a result of Ritchey's injury "he has to pay 27 percent more of his Social Security to live at Autumn Lane, as opposed to what he was paying to live at supportive services, which was a less secure facility." [71] She further testified that that amount equals "$258.47 monthly," "$3,101.64 annually" with a total of "$114,760.68" over the projected life span of Mr. Ritchey. [72]

Ms. Woodson was asked by plaintiff's counsel if she "would like to see Joe in a different kind of facility?" Ms. Woodson's response was as follows:

67. Pretrial conference transcript (dated April 11, 2007), p. 7.

68. Pretrial conference transcript (dated April 11, 2007), p. 10.

69. Pretrial conference transcript (dated April 11, 2007), p. 13.

70. Ms. Suzanne Woodson's testimony is found in volume IV (dated Wednesday, May 16, 2007) beginning at p. 945.

71. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 980.

72. Trial transcript volume IV (dated Wednesday, May 16, 2007), pp. 980-81.

"Yes. That would be nice, to see him in a more modern facility that had more—that could offer him, you know, maybe some more physical therapy and some more speech therapy, some place that would be on one level instead of—Autumn Lane has a couple of levels. He has to—you know, like I believe I had said before, he has to go up and down stairs there because they have the lunchroom and bedrooms on different floors. They don't have any air conditioning. I would like to, you know, see him in a place where maybe they would have some kind of secure area on the outside where he could go and sit." [73]

No objection was taken during this line of questioning. Plaintiff's counsel later asks Ms. Woodson if she had actually looked into a different facility for Joe. Ms. Woodson's response was:

"There is a more modern facility called Rolling Hills Manor which is closer to where I live, and it's all one level. It offers physical therapy and speech therapy. They have a—they do have an outside courtyard area that is gated off for residents' safety, and they have flowers planted around, and it's more aesthetically pleasing." [74]

Plaintiff's counsel then asked if "places like that accept a portion of the resident's Social Security Disability benefits?" [75] Ms. Woodson started to answer when Brody's counsel asked to approach whereupon a bench conference occurred.

---

73. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 983.

74. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 984.

75. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 984.

At side-bar, the court did reference an "agreement," stating that there was "nothing discussed about another facility or additional costs."[76] The court further states that "we set up an agreement . . . permitt[ing] [plaintiff's counsel] to put in this increased cost, the difference being between the secured and unsecured facility."[77] This court sustained the objection and only permitted testimony regarding the $258.47 monthly and $114,760.68 total figures.[78] Plaintiff's counsel resumed questioning and did not again address the "nicer" or different facility with the witness. Plaintiff's counsel did not provide any numerical figures other than the ones agreed upon by the parties.

In closing, plaintiff's counsel argued:

"You know that his life is a safe one now. He is not out. In order for him to live in that place where he lives, right down by the highway, with no grass around it, a converted school with no air conditioning, no physical therapy, no speech therapy, with that, it is going to cost him, according to the testimony you have received, $258.47 per month . . . ."[79]

Brody's counsel did not object to this argument at the time of trial.

---

76. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 985.

77. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 986. The court, although referencing an agreement, acknowledges that the precise terms of this stipulation or agreement are not found in the pretrial conference transcript.

78. Trial transcript volume IV (dated Wednesday, May 16, 2007), p. 986.

79. Trial transcript volume VI (dated Friday, May 18, 2007), p. 1458.

Brody's post-trial motion states that prior to trial, and at plaintiff's request, defendants stipulated that if plaintiff had a normal life expectancy he would incur additional personal care costs of $114,760.68 to reside at Autumn Lane and that Ms. Woodson's testimony regarding a "nicer" nursing home and counsel's closing arguments regarding the conditions at Autumn Lane were prejudicial and contrary to the stipulation.

Even if the testimony offered by Ms. Woodson was contrary to the stipulation, a new trial is not warranted merely because some irregularity occurred during trial or another trial judge would have ruled differently. The moving party must demonstrate prejudice resulting from the mistake.[80]

If a verdict bears a reasonable relationship to damages proved and also comprehends resolution of disputed liability, the court cannot substitute its judgment for that of the jury.[81] The function of determining whether a jury's verdict is "arbitrary and capricious lies with the trial court, and its decision will not be set aside in the absence of clear error of law or palpable abuse of discretion."[82] While the appellate court will look at the entire record to determine whether an unjust verdict has been rendered, it is justified in declaring the lower court guilty of such an abuse of discretion only if the appellate court is clearly convinced by the record that the jury was in-

80. *Commonwealth, Department of General Services,* 927 A.2d at 723.

81. *Alexander v. Knight,* 197 Pa. Super. 79, 177 A.2d 142, 146 (1962).

82. *Dawson v. Fowler,* 384 Pa. Super. 329, 332, 558 A.2d 565, 566 (1989).

532

fluenced by "partiality or some misconception of the law or the evidence." [83] Compromise verdicts are allowable, and the compromise may arise out of damages or negligence or balance of evidence concerning both. However, a verdict is not proper compromise when it derives from misunderstanding, passion, prejudice or other improper motive factor.[84]

The testimony of Ms. Woodson and plaintiff's closing argument in their entirety were not prejudicial in that this court prevented plaintiff from introducing any monetary figures other than the figures agreed upon by the parties. It is clear to this court that the jury simply disregarded the figures presented and reached a compromise verdict with the intention of awarding the plaintiff a total of $1,500,000. As such, this court will not mold the verdict.

83. *Dawson,* 384 Pa. Super. at 333, 558 A.2d at 566.
84. *Alexander,* 177 A.2d at 146.